<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOHN F. O'CONNELL,** | |
| **Plaintiff,** | **Civil Action No. 12-49 (ES) (JAD)** |
| **v.** | **OPINION AND ORDER** |
| **NEW JERSEY TURNPIKE AUTHORITY, et al.,** | |
| **Defendants.** | |

SALAS, DISTRICT JUDGE

## I.    Introduction

Presently before the Court is Defendant New Jersey Turnpike Authority's ("NJTA") Motion for Summary Judgment. (D.E. No. 59). In this action, Plaintiff Colonel John F. O'Connell, an NJTA employee in the Department of Law, claims that he was the victim of a hostile work environment in violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. 10:5–1, *et seq.* (West 2015) (the "LAD") and the New Jersey Constitution. Plaintiff is seeking compensatory and punitive damages. NJTA argues that it is entitled to summary judgment because: (1) Plaintiff has failed to demonstrate that the conduct at issue was sufficiently severe or pervasive enough to make a reasonable person believe the conditions of his employment were altered and the working environment was hostile or abusive; and (2) NJTA may not be held vicariously liable for its employee's conduct because it had an anti-harassment policy in place which prevented and cured the harassment at issue. For the reasons set forth below, the Court GRANTS summary judgment to NJTA and dismisses Plaintiff's claims with prejudice.

## II.      Procedural Background

Plaintiff originally filed this action against NJTA and five individual defendants in state court on November 29, 2011.  (D.E. No. 1, Ex. A).  The action was removed to this Court on January 3, 2012.  (D.E. No. 1).  Plaintiff filed an Amended Complaint on November 19, 2012. (D.E. No. 21 ("Am. Compl.")).[1]

By Stipulation and Order dated November 30, 2012, this Court dismissed with prejudice all claims against the five individuals and the Third Count of Plaintiff's Amended Complaint (alleging negligent infliction of emotional distress) against all parties.  (D.E. No. 25).  Thus, the remaining claims in this action are Counts One, Two, and Four in the Amended Complaint, and the only Defendant remaining is NJTA.  NJTA filed its Answer to the Amended Complaint on December 13, 2012, (D.E. No. 27), and the case thereafter proceeded through discovery.

On June 2, 2014, the Court set a date of July 24, 2014 for global filing of the papers related to NJTA's motion for summary judgment.  (D.E. No. 58).  In accordance with the global briefing schedule, NJTA filed a motion for summary judgment seeking a dismissal of Plaintiff's Amended Complaint in its entirety, with prejudice, (*see* D.E. No. 59-2, Brief on Behalf of Defendant New Jersey Turnpike Authority in Support of its Motion for Summary Judgment ("Def. Mov. Br.")), Plaintiff filed opposition, (*see* D.E. No. 61, Plaintiff John F. O'Connell's Brief in Opposition to Defendant New Jersey Turnpike Authority's Motion for Summary Judgment ("Pl. Opp. Br.")), and NJTA filed a reply, (*see* D.E. No. 62, Reply Brief on Behalf of Defendant New Jersey Turnpike Authority in Further Support of its Motion for Summary Judgment ("Def. Reply Br.")).

---

[1] On November 26, 2012, the Court *sua sponte* filed a letter order directing the parties to clarify whether the Court has subject matter jurisdiction over the claims in this case.  (D.E. No. 22).  The parties submitted their letter briefs in accordance with the Court's order, (D.E. Nos. 26, 28), but the Court did not issue a formal ruling.  The Court hereby finds that it has jurisdiction pursuant to 28 U.S.C. § 1332: the preamble to Plaintiff's Amended Complaint states that he is a resident of Virginia, Defendant NJTA is a resident of the State of New Jersey, and the amount in controversy exceeds $75,000.  (*See* D.E. No. 26 at 1–3).  Plaintiff cites no law showing why the Court should disregard the stated place of residence in the Amended Complaint.  (*See* D.E. No. 28 at 1–2).

On September 17, 2014, NJTA filed a supplemental letter brief alerting the Court to a September 16, 2014 decision of the New Jersey Appellate Division relating to vicarious liability under the LAD, (D.E. No. 63, ("Def. Ltr. Br.")), and Plaintiff filed opposition, (D.E. No. 64, ("Pl. Opp. Ltr. Br.")).  On February 11, 2015, the New Jersey Supreme Court issued an opinion on the same vicarious liability issue, and the Court ordered the parties to submit a five page letter brief explaining the decision's impact on the pending summary judgment motion.  (D.E. No. 65).  NJTA filed its letter brief on February 19, 2015, (D.E. No. 66, ("Def. Supp. Ltr. Br.")), and Plaintiff filed his opposition on February 27, 2015, (D.E. No. 67, "Pl. Opp. Supp. Ltr. Br.")).  The motion for summary judgment is now ripe for adjudication.

## III.    Factual Background[2]

Plaintiff alleges that he was subjected to harassment at NJTA based on his services in the armed forces.  From September 2002 through the present, Plaintiff has been employed full-time as a Staff Attorney in the NJTA Law Department.  (SUMF ¶ 3).  Plaintiff was not a military service person at the time of his September 2002 hiring, but entered the military in May 2003.  (*Id.* ¶ 4).  Between May 2003 and 2012, Plaintiff estimates that he has been absent from his NJTA employment for approximately "2,200 days," or "about six years or so."  (*Id.* ¶ 11).  Every request for military leave that Plaintiff has made while employed by NJTA has been granted, Plaintiff's

---

[2] These background facts are taken from the parties' submissions in accordance with L.Civ.R. 56.1. (D.E. No. 59-1, Local Rule 56.1 Statement of Undisputed Material Facts ("Def. SUMF"); D.E. No. 61-1, Plaintiff John F. O'Connell's Response to Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. SUMF"); D.E. No. 62-2, Reply to Plaintiff's Response to Defendant NJTA's Local Rule 56.1 Statement of Undisputed Material Facts ("Def. Reply SUMF") (collectively "SUMF")).  Plaintiff also properly submitted a supplemental statement of disputed facts with his opposition papers, (*see* Pl. SUMF at 45–59 ("Pl. SDMF")), to which the NJTA replied, (D.E. No. 62-1, Defendant's Response to Plaintiff's Rule 56.1 Statement of Material Facts ("Def. SDMF") (collectively "SDMF")).  The Court must, of course, "disregard all factual and legal arguments, opinions and any other portions of the 56.1 Statement which extend beyond statements of facts."  *Globespanvirata, Inc. v. Tex. Instrument, Inc.*, 2005 U.S. Dist. LEXIS 27820, at *10 (D.N.J. Nov. 10, 2005).  Moreover, to the extent that Plaintiff's factual statements rely on his June 30, 2014 Declaration, (D.E. No. 61-1), the Court will not consider any such statements that are either contradicted by Plaintiff's deposition testimony, *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007), or based upon speculation or conjecture, *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

Law Department position was always held open for him while he was on military leave, and he was always promptly reinstated upon his return from active duty. (*Id.* ¶¶ 13, 15).

### A. Plaintiff's Supervisors

There are approximately nine to ten attorneys in the NJTA Law Department. (*Id.* ¶ 3). As a Staff Attorney, Plaintiff worked under NJTA Director of Law, George Caceres, Esq., from September 2002 until Mr. Caceres left the NJTA in October 2010. (*Id.* ¶ 5). At all times, Plaintiff believed that Mr. Caceres was fair, direct, and honest with Plaintiff. (*Id.*). When Mr. Caceres terminated his NJTA employment in October 2010, the then-Deputy Director of Law, Linda Cavanaugh, Esq., assumed the position of "Acting" Director of Law until a permanent replacement was named. (*Id.* ¶ 8). Ms. Cavanaugh left her NJTA employment ten months later, in August 2011. (*Id.*). During the entire ten-month period of time that Ms. Cavanaugh served as "Acting" Director of Law (October 2010 until August 201l), Plaintiff was away from NJTA on military leave and not performing any work for NJTA. (*Id.* ¶ 9). Plaintiff testified that throughout their NJTA employment together, Ms. Cavanaugh treated him fairly. (*Id.*). Plaintiff's current supervisor is NJTA General Counsel Bruce Harris, Esq. (*Id.* ¶ 10). None of Plaintiff's allegations in this lawsuit relate to the acts or conduct of Mr. Harris. (*Id.*).

### B. NJTA's Anti-Harassment Policy

At all times during Plaintiff's employment, the NJTA has had in place an Equal Employment Opportunity/Non-Discrimination Policy (the "Policy") that expressly forbids discrimination against employees and applicants for employment on the basis of their "military status," and states that "[h]arassment is a kind of discrimination and, likewise, will not be tolerated at the NJTA." (*Id.* ¶¶ 17–19). The Policy sets forth a grievance and investigation process, with which Plaintiff has been familiar at all times during his employment. (*Id.* ¶¶ 20–25, 29). NJTA

4

mandates training for all employees with respect to the Policy.  (*Id.* ¶¶ 31–39).

### C. Allegations of Harassment

Plaintiff alleges multiple instances of harassment.  (*See* Pl. Opp. Br. at 23–24).  The Court has parsed the record and sets forth below the facts relating to Plaintiff's allegations.

#### 1. Plaintiff's Salary

Plaintiff admits that he has received regular pay raises while employed at NJTA, but alleges that his salary was not "raised consistent with others and with the level of work [Plaintiff] was performing," constituting harassment.  (SUMF ¶¶ 40–41).[3]  Plaintiff was hired in 2002 with a starting salary of $80,000 per year, which was increased to $90,552 (as of January 1, 2005), $94,210 (as of January 1, 2006), then $99,317 (as of January 1, 2008), and $102,296 (as of January 1, 2009).  (*Id.* ¶ 53).  Since that time, no non-bargaining unit employees (such as NJTA attorneys) have received salary increases without changing positions.  (*Id.* ¶ 54).

It is undisputed that NJTA has not conducted performance evaluations for Law Department attorneys during Plaintiff's employment.  (*Id.* ¶ 50).  While Mr. Caceres was NJTA Director of Law from September 2002 until October 2010, he never requested a salary increase for himself, for any of the approximately nine to ten attorneys who worked under him, or for any of the approximately fifteen staff members who worked in the Law Department.  (*Id.* ¶ 51).  Ms. Cavanaugh did not have authority to give raises or promotions, but would give "opinions" on employees if asked; however, there are no facts to suggest that Ms. Cavanaugh provided input on Plaintiff's raise eligibility or amount.  (*Id.* ¶ 52).

Experience and years of admittance to the Bar are among the criteria used to set NJTA employee salaries.  (*Id.* ¶ 44).  Plaintiff admits he has no evidence regarding the criteria used to

---

[3] At the time of Plaintiff's hire, he was not in the military, and Plaintiff does not allege that his starting salary was influenced in any way by discrimination against military service personnel.  (*Id.* ¶ 43).

determine either (1) his own salary; or (2) salary increases.  (*Id.* ¶ 42).

Plaintiff admits that some staff attorneys receive higher salaries than his, and others receive lower salaries.  (*Id.* ¶ 55).  Two staff attorneys who are not in the military earned less salary than Plaintiff.  (*Id.* ¶¶ 47, 48).  An attorney who was hired in May 2006 started at a salary higher than Plaintiff's, but Plaintiff admits that he has no reason to believe that military service (or lack thereof) played a role in setting this salary.  (*Id.* ¶ 57).  Likewise, Plaintiff admits that he does not know what factors determined the salary of another attorney who earned $3,000 less than Plaintiff between 2005 and 2006, but who began earning $500 more per year than Plaintiff in 2007.  (*Id.* ¶ 58).  Finally, Plaintiff admits that he has no evidence that military service status played any role in the earnings of another employee who consistently earned a higher salary than Plaintiff, graduated from law school eleven years prior to Plaintiff, joined NJTA five years prior to Plaintiff, and who received a smaller pay increase than Plaintiff effective January 1, 2005.  (*Id.* ¶¶ 59–61).

### 2. Photographs of Plaintiff

In late 2007 or early 2008, Plaintiff's co-worker Joe Orlando "doctored" two photographs of Plaintiff.  (*See id.* ¶¶ 182–204).  The first photo-shopped picture made it appear as though Plaintiff was speaking at the Republican National Convention.  (*Id.* ¶ 186).  Plaintiff alleges that the photograph was "demeaning" and that it could have suggested that Plaintiff was "breaking the law" (specifically 10 U.S.C. § 771 (2014)) for appearing at a partisan political event in uniform.  (*Id.* ¶ 188).  Plaintiff never spoke to Mr. Orlando about this photograph, and instead showed it to Mr. Caceres.  (*Id.* ¶¶ 189–90).  Mr. Caceres determined that Mr. Orlando's actions did not violate NJTA policy, and Plaintiff admits that Mr. Caceres handled the situation with the photograph properly.  (*Id.* ¶ 191).  Plaintiff and Mr. Caceres then spoke with NJTA Executive Director, Mr. Lapolla, about the photograph.  (*Id.* ¶ 192).

Approximately one week to ten days later, Mr. Orlando created a second altered picture, depicting Plaintiff in uniform shaking hands with former Arkansas Governor Mike Huckabee. (*Id.* ¶ 193). Plaintiff did not believe that this second photograph suggested that he was "breaking the law," but he brought the photograph to Mr. Lapolla, who told Plaintiff he "would take care of it." (*Id.* ¶¶ 194–95). Mr. Orlando indicated that he spoke about the issue with Mr. Lapolla. (*Id.* ¶ 195). Plaintiff did not complain about or produce in evidence any other allegedly harassing photographs from Mr. Orlando after Mr. Lapolla told Plaintiff he "would take care of it." (*Id.* ¶ 196). Aside from Mr. Orlando, the only people who saw the photos were those who Plaintiff showed them to: Mr. Caceres, Mr. Lapolla, and Plaintiff's secretary. (*Id.* ¶ 199).

3.  Vacation Time

Plaintiff has never had a request for vacation time denied while employed by the NJTA. (*Id.* ¶ 14). However, Plaintiff uncovered documentation which showed that he was charged vacation by NJTA when he was on military duty. (*Id.* ¶ 252). Plaintiff's May 6 and 7, 2004, workdays were coded as "vacation" when they should have been coded as "military leave" on the NJTA's payroll records, and Plaintiff provided documentation to NJTA on September 15, 2009 to correct the miscoding. (*Id.* ¶ 254).

4.  Allegations Against Diane Scaccetti

Plaintiff alleges that Diane Scaccetti, a former executive director of NJTA, initially sought to deny one of Plaintiff's vacation requests. (Am. Compl. ¶ 28(k)). However, Ms. Scaccetti testified that she never told Mr. Caceres to deny one of Plaintiff's vacation requests (only that she left it to Mr. Caceres's discretion), nor did she tell Mr. Caceres to reject Plaintiff's military orders to leave for active duty, nor did she suggest to Mr. Caceres that Plaintiff's vacation time be used to cover the time Plaintiff spent on military leave. (SUMF ¶ 134).

7

Plaintiff admits that he has never heard Ms. Scaccetti say anything that was inappropriate or offensive to his status as a military serviceperson.  (*Id.* ¶ 130).  On April 20, 2009, Plaintiff sent an email to Ms. Scaccetti's secretary, Nancy Kanca, requesting a meeting with Ms. Scaccetti.  (*Id.* ¶ 136).  On April 20, 2009—the same day that he requested a meeting with Ms. Scaccetti—Ms. Kanca confirmed in an email a meeting between plaintiff and Ms. Scaccetti the next day (April 21, 2009) at 11:45 a.m.  (*Id.* ¶ 137).  Plaintiff does not recall why he wanted to meet with Ms. Scaccetti in April 2009, whether the meeting actually occurred, or if he ultimately cancelled the meeting.  (*Id.* ¶ 138).

In 2010 Plaintiff attempted to meet with Ms. Scaccetti after he was selected to participate in War College, but his recollection is that the meeting was never scheduled.  (*Id.* ¶ 139).  Plaintiff alleges that he thereafter entered an elevator and encountered Ms. Scaccetti, who did not address him.  (*Id.* ¶ 140).  Ms. Scaccetti testified that she does not recall this episode.  (*Id.* ¶ 142).  Plaintiff never came to learn why Ms. Scaccetti allegedly failed to interact with him in the elevator in 2010, and that he admits that he has no evidence to suggest that her failure to do so was based upon the fact that Plaintiff is a military serviceperson.  (*Id.* ¶ 141–42).

### 5.  Request for Military Orders

Plaintiff admits that documentation exists for every military leave taken by Plaintiff during his NJTA employment.  (*Id.* ¶ 223).  Plaintiff does not object to providing military orders to NJTA, but alleges that it was harassment for NJTA to request copies of certain orders because it required Plaintiff to "jump through hoops" to re-create old military records while Plaintiff was away on military leave.  (Pl. Opp. Br. at 4–9).  Plaintiff alleges that the paper and electronic copies of his military records that he kept at NJTA—in addition to paper and electronic copies that Plaintiff kept at home—"mysteriously went missing," (Bigosinski Cert., Ex. N), but admits that he has no

evidence that anyone at NJTA had anything to do with the disappearance of the files.  (SUMF ¶ 233).

In 2009, Mr. Caceres requested that Plaintiff provide copies of military orders or other documentation to show that his absences coded as military leave were in fact used for military leave, (*id.* ¶ 230), after the NJTA Human Resources department allegedly misplaced some of the orders Plaintiff had previously provided.  (*Id.* ¶ 236).  Plaintiff acknowledges that there were a "handful of days" that he took as military leave that were "unaccounted for."  (*Id.* ¶ 224).

While plaintiff worked under Mr. Caceres, Plaintiff would on occasion take a military leave of absence from work without providing any documentation to verify the basis for the leave.  (*Id.* ¶ 226).  Plaintiff and Mr. Caceres had a "policy" whereby if verbal notice of the need for a military leave was given by Plaintiff, but no documentation was provided, Mr. Caceres would nonetheless approve, coding Plaintiff's timesheet as "Military Leave."  (*Id.* ¶ 227).  On other occasions, Plaintiff provided copies of his military orders to the Human Resources/Payroll department.  (*Id.* ¶ 228).  Mr. Caceres and his confidential secretary, Sharon Vicidomini, were Plaintiff's only points of contact when Plaintiff discussed providing military orders.  (*Id.* ¶ 229).

After Mr. Caceres made the decision to request Plaintiff's military orders, Mr. Caceres approached John O'Hern[4] to ask about NJTA policy.  (*Id.* ¶ 239).  Mr. O'Hern told Mr. Caceres that every NJTA employee needed to have a "status," meaning that if the employee is not in work he or she must be classified as "sick," "vacation," or "military leave," etc.  (*Id.*).  Mr. O'Hern also told Mr. Caceres that "there's got to be some form of documentation to establish that he was, you know, serving in the military at the time."  (*Id.* ¶ 240).

Mr. Caceres, as Plaintiff's supervisor, had a responsibility to account for his employee's

---

[4] Mr. O'Hern held the position of Assistant to the Executive Director, Director of Labor Relations, and Deputy Executive Director at various points between 2002 and 2012.  (SUMF ¶ 124).

time.  (*Id.* ¶ 242).  Plaintiff admits that "simply asking for documentation" does not support Plaintiff's allegations of harassment, but that the "context and manner" in which Mr. Caceres asked for Plaintiff's military orders here supports a claim of harassment.  (*Id.* ¶ 234).  Additionally, Plaintiff states that it would not be harassing for someone from the executive department (such as Mr. O'Hern) to ask for documentation under "ordinary circumstances," but denies that the requests for documents were not harassing here.  (*Id.* ¶ 244).

Plaintiff admits that in this lawsuit he is not alleging that any actions taken by Mr. Caceres were motivated by anti-military discrimination, but instead asserts that "someone at the NJTA" was harassing Plaintiff through Mr. Caceres requesting documentation for Plaintiff's military records.  (*Id.* ¶ 255).

The first email from anyone at NJTA to Plaintiff requesting copies of military orders was sent on July 20, 2009, when Mr. Caceres requested that Plaintiff provide him with copies of his "GITMO Orders in addition to the DD214 documents."  (*Id.* ¶ 248).  The next day, July 21, 2009, Mr. Caceres emailed to Plaintiff scanned copies of his attendance records, which highlighted which days were "without any supporting documentation."  (*Id.* ¶ 249).  Plaintiff responded to Mr. Caceres on the same day, July 21, 2009, and indicated that he was providing for the first time a set of orders for a military leave taken one year earlier (between June 29 and July 2, 2008). (*Id.*).  On July 24, 2009, Mr. Caceres wrote Plaintiff an email proposing that Plaintiff provide pay stubs from the military as an alternative to the military orders that Mr. Caceres had previously requested.  (*Id.* ¶ 250).

On August 14, 2009, Mr. Caceres wrote Plaintiff an email requesting that Plaintiff obtain "any and all official orders that relate to the time in question."  (*Id.* ¶ 251).  On September 11, 2009, Plaintiff received an email which contained a specific list created by Mr. Caceres's secretary,

Sharon Vicidomini, of the twelve "unaccounted days" for which NJTA had no records.  (*Id.* ¶ 252).

Plaintiff alleges that beginning on July 20, 2009, and ending in or about September 2009, Plaintiff received "numerous phone calls per week" from Mr. Caceres relating to Plaintiff's missing military orders.  (*Id.* ¶ 255).  The only emails received by plaintiff from anyone at NJTA on the topic of obtaining military orders or documentation in the July 20 through October 2, 2009, timeframe occurred sporadically over the following 21 business dates: July 21–August 15; September 11–September 15; September 25–October 2, 2009.  (*Id.* ¶ 258).

### 6.  "The War Must Be Over" Comment

On Monday, March 15, 2010, after being away from his NJTA employment for an extended period of military leave and two weeks of vacation, Plaintiff returned to work.  (*Id.* ¶ 205).  Plaintiff alleges that on March 17, 2010, Mr. Orlando noticed him in the cafeteria and said "Oh, look, Jack O'Connell is back, the war must be over."  (*Id.* ¶ 206).  There is no evidence that anyone besides Mr. Caceres was present to hear the comment, and Mr. Caceres testified that he did not hear it. (*Id.* ¶ 207).  Mr. Orlando explained at his deposition that he intended this comment to be complimentary.  (*Id.* ¶ 208).  Plaintiff did not file a formal complaint regarding this comment.  (*Id.* ¶ 209–12).

### 7.  More Time Needed in Office and Promotion

Plaintiff did not have any conversations with any NJTA employees about the prospect of being promoted, other than with Mr. Caceres and one conversation with Ken Rotter[5] in 2008 where the topic was not promotions but rather Plaintiff's future with NJTA, and Plaintiff is unaware of whether any conversations about the prospect of Plaintiff being promoted occurred among any NJTA employees outside of Plaintiff's presence.  (*Id.* ¶¶ 276, 284).  Plaintiff never discussed

---

[5] Mr. Rotter held the position of Acting Executive Director of the NJTA between June/July 2008 and September 2008.  (*Id.* ¶ 276).

promotions with Linda Cavanaugh.  (*Id.* ¶ 285).

On one or two occasions, Ms. Cavanaugh told Plaintiff that she liked his work but that he needed to spend more time at NJTA than in the military service.  (*Id.* ¶ 75).  Ms. Cavanaugh never said anything else that Plaintiff considered to be offensive or which demonstrated hostility towards people in the military service.  (*Id.*).

### 8.  Withholding Assignments

On May 17, 2010, Plaintiff advised Mr. Caceres that he would be reporting to War College for the period of August 1, 2010 until June 10, 2011 and that he anticipated being activated sometime in July 2010.  (*Id.* ¶ 83).  Although not affirmatively asserted as "harassment," Plaintiff found "somewhat distressing" Ms. Cavanaugh's alleged comment on May 27, 2010 along the lines of: "nobody is going to give you any work, everybody knows you are leaving again, so you know, why bother."  (*Id.* ¶¶ 78–80).  However, Ms. Cavanaugh disputes this characterization and testified that had she known Plaintiff was leaving for active duty in two weeks and was in a position to give him work, she would have tried to determine an appropriate assignment to give him for that period. (*Id.* ¶ 80).  Plaintiff testified that if he was scheduled to commence a military leave in two weeks, he "wouldn't consider it inappropriate" for his superior to not assign a project that would last longer than two weeks; Plaintiff admits that following the May 27, 2010 conversation, he worked fourteen full days before commencing War College and leaving NJTA for a two-year period.  (*Id.* ¶¶ 80–81).[6]  Furthermore, at the time this comment was made, Ms. Cavanaugh was not Plaintiff's

---

[6] On or about June 3, 2010, Plaintiff provided to NJTA a copy of his Orders for attendance at "Air War College" between the dates July 25, 2010, and June 11, 2011.  (*Id.* ¶ 84).  Prior to attending War College, Plaintiff requested and was granted approximately twenty-one vacation days on June 15–17, 25, July 1, 2, and 9–23; he was out of the office on military leave on June 2 and 11, and July 6–8, 2010; and he was out of the office on June 7 and 9, 2010 on sick leave.  (*Id.* ¶¶ 85–86).  Plaintiff's War College leave turned into a two-year absence from NJTA (approximately July 2010–June 2012), during which time he did no work for NJTA or at NJTA.  (*Id.* ¶ 88; *see also* Ex. B to D.E. No. 59-8, Feb. 18, 2013 Deposition of John F. O'Connell ("Feb. 2013 O'Connell Dep." at 158:2–21).  However, Plaintiff returned to the NJTA offices at least once while on leave.  (*See* Pl. SUMF ¶ 122 ("Plaintiff returned to the NJTA office several weeks after being told [in June 2011] that his personal items were being 'boxed' and removed.")).

supervisor, and Plaintiff received the majority of his work assignments directly from Mr. Caceres. (*Id.* ¶ 73).

### 9.  Boxing Up of Plaintiff's Belongings

Despite acknowledging that it is an employer's prerogative to determine what can and what cannot be kept in one of its employees' offices, (*id.* ¶ 90), Plaintiff asserts that Ms. Cavanaugh's efforts to "box" up Plaintiff's belongings in his office in June 2011 while he was out of the office for an extended amount of time constituted harassment.  (*Id.* ¶ 107).

When Plaintiff went on his 2010–12 War College leave, he left behind in his office plaques, medals, signed items that had both sentimental and significant real value, a cup full of change, statements on his desk, military items on his walls, and a "tremendous amount of personal stuff." (*Id.* ¶ 108).

Ms. Cavanaugh was aware that Plaintiff had concerns about personal items being taken out of his office, as he had previously complained of items missing from his office.  (*Id.* ¶¶ 96–98). By email dated September 29, 2009, Plaintiff advised both his supervisor Mr. Caceres, and NJTA Executive Director Diane Scaccetti that he kept in his office "military material" which "had great sentimental value and [are] irreplaceable."  (*Id.* ¶ 91).  Plaintiff alleges that prior to June 2011, certain of his documents, files and irreplaceable or significant personal items had been stolen from his office or broken while in his office.  (*Id.* ¶¶ 91–93).  Plaintiff admits that it is "unknown who took these items and they were never found."  (*Id.* ¶ 93).  Plaintiff admits that when Mr. Caceres learned that Plaintiff believed items or computer files from his office had been stolen or damaged, he offered to take Plaintiff to either the Executive Director of NJTA, or the technical/computer experts to discuss his concerns, but Plaintiff did not follow up on this suggestion.  (*Id.* ¶ 94).

On April 11, 2011, shortly after Ms. Cavanaugh became Acting Director of the Law

Department, she emailed Plaintiff and informed him that she was reorganizing the Department and wanted to "see what [his] immediate and long term plans are." (*Id.* ¶ 101). Plaintiff does not consider the April 11, 2011 email to be harassing or inappropriate in any way. (*Id.*). On April 12, 2011, Plaintiff responded and indicated that he was still awaiting official word from the Air Force/Air National Guard and that he would keep Ms. Cavanaugh posted. (*Id.* ¶ 102). On May 18, 2011, Ms. Cavanaugh received a notification from LinkedIn that Plaintiff's professional title had changed. (*Id.* ¶ 103). On June 11, 2011, Plaintiff's military assignment at Air War College ended, pursuant to the Orders given by Plaintiff to NJTA. (*Id.* ¶ 104). As a result of the LinkedIn title change and the expiration of Plaintiff's military assignment, Ms. Cavanaugh sent a letter to Plaintiff on June 21, 2011. (*Id.* ¶ 105). In the first paragraph of the letter, Ms. Cavanaugh asked that Plaintiff identify his "employment intentions for the period beginning June 11, 2011." (*Id.* ¶ 106). Plaintiff does not believe that Ms. Cavanaugh's inquiry into his employment intentions constitutes harassment. (*Id.*).

Ms. Cavanaugh's letter also informed Plaintiff that it was "necessary" to "box" the personal items and belongings that Plaintiff had "left in the Authority offices prior to commencement of [Plaintiff's] current military leave" and asked for Plaintiff's "preference" with respect to who would handle the boxing. (*Id.* ¶ 107).[7]   Plaintiff responded the same day, did not object in any way, and authorized NJTA staff to box his personal items. (*Id.* ¶ 114).

On June 27, 2011, Ms. Cavanaugh wrote another letter to Plaintiff, in which she advised that she had received Plaintiff's military orders dated June 2, 2011, which extended Plaintiff's leave until August 2, 2011. (*Id.* ¶ 116). The letter advised that NJTA was in the process of packing

---

[7] Plaintiff argues that the letter does not provide a "reason to suddenly remove [Plaintiff's] personal belongings" from the office. (Pl. SUMF ¶ 107). In response, NJTA points to four reasons, unrelated to Plaintiff's military service, for Ms. Cavanaugh's request. (Def. Reply SUMF ¶ 107, SUMF ¶¶ 110–12).

Plaintiff's things and asked Plaintiff to advise on the "preferred arrangements for storage of same as these are clearly items of significant personal value to you" and reiterated that NJTA "cannot be responsible for these items." (Bigosinski Cert., Ex. W).  The letter closed by assuring Plaintiff that his job at NJTA was protected.  (SUMF ¶ 118).  At his deposition, Plaintiff initially testified that he did not believe Ms. Cavanaugh's request that he articulate his preference for "box"-ing his personal items constitutes harassment, but later asserted that it was "tantamount to harassment." (*Id.* ¶ 120).

Plaintiff's nephew, Thomas Geant, went to pick up Plaintiff's belongings.  (SDMF ¶ 40). NJTA admits that because Mr. Geant was not an NJTA employee, he was not permitted to leave NJTA offices with Plaintiff's belongs without written authorization from Plaintiff.  (*Id.*  ¶ 40). However, Plaintiff does not dispute that he identified his preferred arrangements for pick-up of his personal belongings, coordinated with his secretary, and his nephew eventually retrieved his personal belongings.  (SUMF ¶ 115).

### 10.   Restricted Building Access

Plaintiff testified that "several weeks after" receiving the June 27, 2011 letter from Ms. Cavanaugh, he returned to the NJTA offices after being gone for approximately one year.  (*Id.* ¶ 122).  Upon arrival at the NJTA building, Plaintiff's security card did not work.  (*Id.*).  Plaintiff got a new security card right away, it was activated, and has worked every day since.  (*Id.*). Plaintiff does not know why his card did not work on that one day in 2011, never asked anyone at the NJTA why his card did not work, and has never come to learn who (if anyone) was responsible for why it did not work.  (*Id.*).

### 11.   Pension Delay

Plaintiff alleges that he was subject to harassment because on July 22, 2011, he received a

notice from the New Jersey Division of Pension and Benefits indicating that the NJTA had "not submitted contributions to us for you since December 31, 2009." (*Id.* ¶ 62). Plaintiff admits that since the time he filed the Complaint, the alleged "missing" contributions in the correct amount have been made. (*Id.* ¶ 63).

Furthermore, it is not disputed that when Plaintiff filed his Amended Complaint on November 29, 2011, he had not received and was unaware of six communications exchanged between NJTA and the New Jersey Division of Pension and Benefits between October 22, 2010 and October 21, 2011 regarding Plaintiff's pension contributions. (*Id.* ¶ 64). After reviewing the documents at his deposition, Plaintiff stated that NJTA "met their obligation" with respect to making pension contributions on his behalf and that it did not "appear" as though they had done anything wrong. (*Id.* ¶ 65). Plaintiff admits that the mistake was on the part of the New Jersey Division of Pension and Benefits, and was corrected through the efforts of NJTA. (*Id.*; ¶¶ 66–69). As part of these efforts, Ms. Cavanaugh asked Plaintiff to contact her directly about the pension issue so that she could "stay on top of it." (*Id.* ¶ 68).

### 12. Restricting Access to DoD Websites

Plaintiff alleges in his opposition brief that it was harassment for NJTA to restrict his access to certain Department of Defense websites. (Pl. Opp. Br. at 24, 26–27). It is undisputed that for one day in May 2013, Plaintiff could not access certain military websites while the entire NJTA was upgrading its web-filtering software. (Def. SDMF at 105). On May 1, 2013, Plaintiff's counsel alerted defense counsel to the problem, and by May 2, 2013, the problem was corrected. (*Id.*). Since May 2, 2013, Plaintiff has been given "unrestricted access" to all websites, and has not reported any problems. (*Id.*). The NJTA Information Technology Department was responsible for upgrading the web-filtering software, and no one was ever instructed to restrict Plaintiff's

16

access to military-related websites.  (*Id.*).

## IV.    **Legal Standard**

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and, while viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to a judgment as a matter of law.  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists for trial when a reasonable finder of fact could return a verdict for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "To be material, a fact must have the potential to alter the outcome of the case."  *DeShields v. Int'l Resort Properties Ltd.*, 463 F. App'x 117, 119 (3d Cir. 2012).

The moving party must first show that no genuine issue of material fact exists.  *Celotex Corp.*, 477 U.S. at 323.  If the movant meets this burden, the burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial.  *Id.* at 324.  Although the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party, *see Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995), the non-moving party must offer specific facts that establish a genuine issue of material fact—not just "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings, or unsupported assertions, bare allegations, or speculation to defeat summary judgment.  *See Celotex,* 477 U.S. at 324; *Longstreet v. Holy Spirit Hosp.*, 67 F. App'x 123, 126 (3d Cir. 2003).

## V.    Discussion

### A.   New Jersey Law Against Discrimination

Plaintiff alleges that he was subjected to a hostile work environment in violation of the LAD, which entitles him to compensatory and punitive damages.   NJTA argues that summary judgment is appropriate in this case because:  (1) Plaintiff has failed to demonstrate that the conduct at issue in his harassment claim was sufficiently severe or pervasive enough to make a reasonable person believe the conditions of his employment were altered and the working environment was hostile or abusive; (2) NJTA may not be held vicariously liable for the complained-of conduct; and (3) Plaintiff has failed to show that punitive damages are appropriate.  Because the Court finds that Plaintiff has not made out a prima facie case of a hostile work environment, or that NJTA engaged in "egregious conduct" that would permit punitive damages, the Court will grant summary judgment to NJTA.

### 1.   Hostile Work Environment[8]

The LAD prohibits an employer from discriminating against an employee "because of the liability for service in the Armed Forces of the United States."  N.J. Stat. Ann. § 10:5–12(a) (West 2015).  The Plaintiff has the initial burden of presenting a prima facie hostile work environment claim.  *See Aguas v. State of New Jersey*, No. 072467, 2015 WL 659543, at *17 (N.J. Feb. 11, 2015).[9]  To establish a cause of action under the LAD based on a hostile work environment, plaintiffs must satisfy each part of a four-part test.  Specifically, they must show "that the complained-of conduct (1) would not have occurred but for the employee's protected status, and

---

[8] Although the first count of Plaintiff's Amended Complaint alleges both "Discrimination and Harassment" in violation of the LAD, Plaintiff's opposition brief only addresses a claim based on hostile work environment.  (*See* Pl. Opp. Br. at i–ii).  Accordingly, the Court deems Plaintiff's claim for discrimination in violation of the LAD abandoned and awards summary judgment to NJTA on the discrimination claim.  *See Cicchiello v. Beard*, 726 F.Supp.2d 522, 531 (3d Cir. 2010) (claim deemed abandoned when plaintiff failed to address it in her brief in opposition to defendants' motion for summary judgment).

[9] The slip opinion and Westlaw/Lexis are the only citations available as of this writing.

was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive." *Shepherd v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 24 (2002) (citing *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 603–04 (1993)).   "Within that framework, a court cannot determine what is 'severe or pervasive' conduct without considering whether a reasonable person would believe that the conditions of employment have been altered and that the working environment is hostile.   Thus, the second, third, and fourth prongs are, to some degree, interdependent."   *Id.* (citing *Lehmann*, 132 N.J. at 604).

The court weighs the "severity and pervasiveness by considering the conduct itself rather than the effect of the conduct on any particular plaintiff." *El-Sioufi v. St. Peter's Univ. Hosp.*, 382 N.J. Super. 145, 178 (N.J. Super. Ct. App. Div. 2005).   The Court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."   *Shepherd*, 174 N.J. at 19–20 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

"A hostile work environment exists when a workplace is permeated with discriminatory intimidation, ridicule and insult so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Cortes v. Univ. of Med. & Dentistry of New Jersey*, 391 F. Supp. 2d 298, 308 (D.N.J. 2005).   "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." *Heitzman v. Monmouth Cnty.*, 321 N.J. Super. 133, 147 (App. Div. 1999), *overruled on other grounds*, *Cutler v. Dorn*, 196 N.J. 419 (2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).   "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

19

changes in the terms and conditions of employment." *Id.* (internal quotation marks omitted). "Although a person is legally entitled to a work environment free of hostility, she is not entitled to a perfect workplace, free of annoyances and colleagues she finds disagreeable.  In short, what is illegal is a 'hostile work environment,' not an 'annoying work environment.'" *Herman v. Coastal Corp.*, 348 N.J. Super. 1, 23 (App. Div. 2002) (citation omitted).

Here, the most significant allegations of harassment essentially boil down to the following incidents: (1) "friendly" co-worker Joe Orlando gave two photo-shopped photographs to Plaintiff within a period of seven to ten days in late 2007 or early 2008, (SUMF ¶¶ 182–204), and he made a comment in March 2010 along the lines of, "Oh, look, Jack O'Connell is back, the war must be over"; (*id.* ¶¶ 205–17); (2) over the course of twenty-one business days in the Summer of 2009, Plaintiff's supervisor, George Caceres, requested copies of Plaintiff's Military Orders for unaccounted days taken by Plaintiff as "Military Leave"; (*id.* ¶¶ 248–59); (3) on May 27, 2010, Plaintiff had a brief conversation with then-Deputy Director of Law Linda Cavanaugh, Esq., prior to beginning a lengthy leave of absence during which Ms. Cavanaugh allegedly told him "nobody is going to give you any work, everybody knows you are leaving again, so you know, why bother"; (*id.* ¶¶ 70–89); (4) in June 2011, as Acting Director of Law, Ms. Cavanaugh asked that plaintiff state his preference for "box"-ing the personal belongings left behind in his office while he was away on a two-year military leave; (*id.* ¶¶ 90–122).  Plaintiff also alleges "gag orders," denial of access to DoD websites, restricted building access, purposefully delaying pension payments, issues surrounding his vacation time, and salary inconsistencies.  (*See* Pl. Opp. Br. 23–24).

Even giving the most favorable inferences to Plaintiff, the Court concludes that a rational factfinder could not reasonably determine that the complained-of conduct was sufficiently severe or pervasive to have created a hostile work environment.  The totality of evidence in the record

does not suggest that the complained-of conduct was frequent or chronic (especially given the almost seven-year timeframe), that it was severe or physically threatening in any way, that it unreasonably interfered with Plaintiff's work performance, or that the work environment in general was hostile.  *See Shepherd*, 174 N.J. at 19–20 (citation omitted).  Furthermore, even though Plaintiff need not show that NJTA intentionally harassed him or intended to create a hostile work environment, *see Lehman*, 132 N.J. at 604–05, the Court notes that there is no evidence in the record to suggest that any of the complained-of conduct was motivated by discriminatory animus towards individuals serving in the armed forces.

Plaintiff strains the record in an attempt to raise a genuine issue of material fact with respect to the complained-of conduct, but the Court is guided by the principle that contradictory affidavits, unsupported assertions, speculation, or conclusory allegations are insufficient to defeat summary judgment.  *See Longstreet*, 67 F. App'x at 126; *Solomon v. Soc'y of Auto. Eng'rs*, 41 F. App'x 585, 586 (3d Cir. 2002).  In short, even though the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party, *see Pa. Coal Ass'n*, 63 F.3d at 236, the Court must still examine the fact in the record in a light "stripped of the overlay of [Plaintiff's] subjective reactions," *Godfrey v. Princeton Theological Seminary*, 196 N.J. 178, 198–99 (2008).

Plaintiff's allegations of denial of access to DoD websites, restricted building access, purposefully delaying pension payments, "gag orders," issues surrounding his vacation time, and salary inconsistencies, (*see* Pl. Opp. Br. 23–24), are undermined by the record when viewed objectively, as described below.

First, the denial of access to DoD websites concerns Plaintiff's inability to access the websites on a single day in May 2013 while the entire NJTA was upgrading its web-filtering software.  (Def. SDMF at 105).  Plaintiff has not reported any issues since the single day of

inaccessibility.  (*Id.*).

Second, with respect to restricted building access, Plaintiff could not enter the NJTA building after being gone for approximately one year.  (SUMF ¶ 122).  Plaintiff got a new security card right away, it was activated, and has worked every day since.  (*Id.*).  Plaintiff does not know why his card did not work on that one day in 2011, never asked anyone at NJTA why his card did not work, and has never come to learn who (if anyone) was responsible for why it did not work. (*Id.*).

Third, with respect to the missing pension contributions, Plaintiff stated that NJTA had "met their obligation" and that it did not "appear" as though they had done anything wrong.  (*Id.* ¶ 65).  Plaintiff admits that the mistake was on the part of the New Jersey Division of Pension and Benefits, and was corrected through the efforts of NJTA.  (*Id.* ¶¶ 66–69).

Fourth, the "gag order" Plaintiff references is Ms. Cavanaugh's request that Plaintiff send any inquiries about the pension payments directly to Ms. Cavanaugh, which as she testified, was so that she could stay on top of the issue.  (*See id.* ¶ 68).

Fifth, with respect to vacation time, Plaintiff has never had a request for vacation time denied while employed by NJTA, (*id.* ¶ 14), and the two days that were mistakenly coded as "vacation" instead of "military leave" were adjusted once flagged.  (*Id.* ¶¶ 252–54).

Finally, Plaintiff's allegations regarding "salary differentials" must be viewed in light of the fact that he has received salary increases, and that there is no evidence showing that he was given less favorable increases, let alone a less favorable increase motivated by animus towards service in the armed forces.  (*See id.* ¶¶ 40–61).

Likewise, the evidence surrounding the other allegations—including the doctored photographs, the request for military orders, the "box"-ing of Plaintiff's belongings, and comments

regarding Plaintiff's time in the office—must be viewed objectively, and the Court provides the over-arching context below.

First, the doctored photographs were created by a "friendly" co-worker, (Def. SDMF ¶ 3), were not seen by anyone other than those individuals whom Plaintiff showed them to, (SUMF ¶ 199), and did not have an adverse impact on Plaintiff's professional or military career, (*id.* ¶ 184). Plaintiff did not complain about or produce in evidence any other allegedly harassing photographs from Mr. Orlando after Mr. Lapolla told Plaintiff he "would take care of it." (*Id.* ¶ 196). Likewise, there is no evidence that anyone besides Mr. Caceres was present to hear Mr. Orlando's "the war must be over" remark, and Plaintiff did not file a formal complaint regarding this comment. (*Id.* ¶ 207–12).

Second, Plaintiff acknowledges that there were a "handful of days" that he took as military leave that were "unaccounted for." (*Id.* ¶ 224). It is undisputed that it is generally appropriate for an employer to request documentation for military leave. *See Brooks v. Fiore*, No. 00–803, 2001 WL 1218448, at *10 (D. Del. Oct. 11, 2001) *aff'd*, 53 F. App'x 662 (3d Cir. 2002) ("USERRA does not prohibit employers from requiring certain notification procedures or documentation of military leave."). The requests for documentation occurred sporadically over a period of twenty-one days in 2009, while Plaintiff was on military leave. (*See* SUMF ¶ 258).

Third, Plaintiff never asked why Ms. Cavanaugh made the request for him to identify a preference to box the personal belongings that he left in his office prior to his extended military leave, and he never objected to the request. (*Id.* ¶ 114). Plaintiff acknowledges that it is an employer's prerogative to determine what can and what cannot be kept in one of its employees' offices, (*id.* ¶ 90), and Ms. Cavanaugh identified four distinct reasons not predicated on animus towards Plaintiff's service in the military to ask that Plaintiff identify his preference for boxing his

personal items, (*see id.* ¶¶ 110–12).

Finally, on one or two occasions, Ms. Cavanaugh told Plaintiff that she liked his work but that he needed to spend more time at NJTA than in the military service.  (*Id.* ¶ 75).  Ms. Cavanaugh never said anything else that Plaintiff considered to be offensive or which demonstrated hostility towards people in the military service.  (*Id.*).  And although Plaintiff does not affirmatively assert it as an example of "harassment," Plaintiff found "somewhat distressing" Ms. Cavanaugh's alleged comment on May 27, 2010 along the lines of: "nobody is going to give you any work, everybody knows you are leaving again, so you know, why bother."  (*Id.* ¶¶ 75, 78–79).

New Jersey state and federal courts applying the LAD have consistently found that a severe or pervasive work environment did not exist when confronted with conduct more egregious than that which took place here.  To be sure, the Court could not locate any cases that squarely address, at the summary judgment stage, a hostile work environment claim under the LAD premised on service in the armed forces.  Nevertheless, the Court is guided by decisions in other contexts such as sexual- and race-based harassment, which reveal the contours of the "severe or pervasive requirement."  *See*, *e.g.*, *Shepherd*, 174 N.J. at 25 (listing cases).  It is within these contours that the Court finds that Plaintiff has failed to establish a severe or pervasive work environment.

For example, in *Morales-Evans v. Admin. Office of the Courts of New Jersey*, 102 F. Supp. 2d 577 (D.N.J. 2000), the plaintiff alleged that her supervisor made several inappropriate advances and comments.  She claimed that her supervisor attempted to kiss her on several occasions.  *Id.* at 588.  She also alleged that the supervisor referred to her as "voluptuous," commented about the breasts of other female employees, and described his visit to a nude beach, comparing his physical attributes to that of other beachgoers.  *Id.*  However, the Court granted summary judgment, finding that no reasonable juror could find that these actions over an extended period of time constituted

pervasive harassment.  *Id.* at 590.

Similarly, in *Lynch v. New Deal Delivery Service*, 974 F. Supp. 441 (D.N.J. 1997), the plaintiff alleged multiple inappropriate comments.  She claimed that her supervisor had made several phone calls to her at night during which he addressed her as "babe."  *Id.* at 447.  She also alleged that the supervisor commented on her physique, and invited plaintiff to workout and have dinner afterwards.  *Id.*  She claimed that the supervisor had asked for the key to the apartment that she was renting, and then inquired about her sex life.  *Id.*  Plaintiff further alleged that the supervisor divulged that his marriage was falling apart and made comments about having to fire a secretary who was "too pretty."  *Id.*  Plaintiff also claimed that she had seen a supervisor "put his hands on women."  *Id.*  Still, the Court granted summary judgment, finding that no factfinder could conclude that the plaintiff was subjected to a work environment that was so hostile as to alter the conditions of employment.

In *Reyes v. McDonald Pontiac GMC Truck, Inc.*, 997 F. Supp. 614 (D.N.J. 1998), the plaintiff alleged multiple instances of harassment over a seven-day period.  Plaintiff alleged that a co-worker verbally abused her and yelled, "Who the fuck told you to call my customer . . . you don't go calling my customer . . . how the fuck do you think I'm going to deliver a car today."  *Id.* at 616.  Plaintiff further alleged that the same co-worker threw a deal jacket at her and called her "Miss Fucking Queen Bee" in front of customers in the showroom.  *Id.*  She also alleged that during a meeting, the same co-worker referred to plaintiff as a "bitch" and stated, "Look, we don't have to be lovers," to which plaintiff responded, "That will never happen."  *Id.*  At that point, the co-worker got up to leave, and while doing so, he pushed back in his chair, and the table slid a short distance and hit plaintiff in the chest.  *Id.*  The Court found that these incidents "were not cumulatively regular or pervasive enough" and granted summary judgment to the defendant.  *Id.*

at 619.

Comparable results can be found in the racial discrimination context under the NJLAD.  In *Watkins v. Nabisco Biscuit Co.*, 224 F. Supp. 2d 852 (D.N.J. 2002), the plaintiff presented the following evidence in support of his harassment claim: (1) the turning around and ultimate removal of plaintiff's Ebony Fashion Fair calendar by a co-worker; (2) the placement of a plastic hatchet and scalpel in plaintiff's mailbox, and three-dollar bills marked with the words "weird bird" and "faggot go home" on his desk; (3) the withholding of information by plaintiff's team workers; (4) the failure to include plaintiff in company meetings; and (5) the contravening of plaintiff's authority by allowing his subordinates to make decisions that were the responsibility of the plaintiff.  *Id.* at 864.  However, the Court granted summary judgment, finding that no reasonable juror could find that a reasonable person would believe that plaintiff's work conditions were somehow altered or that the work environment was hostile.  *Id.* at 866.

Additionally, where a coworker made "several disparaging remarks" referencing a plaintiff's national origin, along with several physically threatening comments, the Third Circuit found that the comments did "not establish that discrimination was pervasive." *Kidd v. MBNA Am. Bank, N.A.*, 93 F. App'x 399, 402 (3d Cir. 2004).

These cases demonstrate that the complained-of conduct here is not sufficiently severe or pervasive to establish a prima facie case of harassment under the LAD.  Accordingly, the Court will grant summary judgment to NJTA on Plaintiff's LAD harassment claim.  Because the Court finds that Plaintiff has failed to set forth a prima facie case of harassment under the LAD, it declines to substantively analyze whether NJTA's anti-harassment policy is sufficient to shield it from vicarious liability pursuant to *Aguas*, since any further analysis would be dicta.  *See Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007) (explaining that reasoning in excess

26

of what is necessary to reach a conclusion is dicta).  The Court nevertheless appreciates the parties'
supplemental briefing on this issue.

## 2.   Punitive Damages[10]

NJTA seeks summary judgment on Plaintiff's request for punitive damages for the alleged
LAD violations.  (*See* Am. Compl. at 11, 14).  Because Plaintiff has not offered any evidence of
"egregious conduct," the Court grants summary judgment to NJTA.

"[P]unitive damages are only to be awarded in exceptional cases even where the LAD has
been violated."  *Catalane v. Gilian Instrument Corp.*, 271 N.J. Super. 476, 500–01 (App. Div.
1994).  "A plaintiff asserting a punitive damages claim in a LAD case against a public entity such
as the [NJTA] must meet a high standard.  A public sector employer whose egregious conduct
violates the LAD may be held liable for punitive damages . . . only in the event of actual
participation by upper management or willful indifference."  *Aguas v. State of New Jersey*, No.
072467, 2015 WL 659543, at *20 (N.J. Feb. 11, 2015) (internal quotations marks and citations
omitted).  The plaintiff must prove "egregious conduct" on the part of the defendant by "clear and
convincing evidence."  *Id.*  For such damages, "a higher level of culpability than mere negligence"
is required.  *Id.*

For purposes of this analysis, defining the employer's "upper management" is a fact-
sensitive inquiry.  *Id.* at *21.  Labels or titles are not determinative; instead, the inquiry focuses on
whether an employee possesses significant power, discretion and influence.  *Id.*  In *Cavuoti v. New
Jersey Transit Corp.*, the New Jersey Supreme Court explained that

upper  management  would  consist  of  those  responsible  to  formulate  the

---

[10] Although Plaintiff's Amended Complaint seeks punitive damages for violations of both the LAD and the New
Jersey Constitution, Plaintiff's opposition brief only addresses punitive damages under the LAD.  (See Pl. Opp. Br. at
i–ii).  Accordingly, the Court deems Plaintiff's claim for punitive damages for violations of his civil rights under the
New Jersey Constitution abandoned and awards summary judgment to NJTA on the this claim.  *See Cicchiello v.
Beard*, 726 F. Supp. 2d 522, 531 (3d Cir. 2010) (claim deemed abandoned when plaintiff failed to address it in her
brief in opposition to defendants' motion for summary judgment).

organization's anti-discrimination policies, provide compliance programs and insist on performance (its governing body, its executive officers), and those to whom the organization has delegated the responsibility to execute its policies in the workplace, who set the atmosphere or control the day-to-day operations of the unit (such as heads of departments, regional managers, or compliance officers).  For an employee on the second tier of management to be considered a member of "upper management," the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace. Obviously such instructions should be tailored to the facts of the case and might be accompanied by special interrogatories when several officers are presented as members of "upper management."

161 N.J. 107, 128–29 (1999).  Thus, this fact-sensitive inquiry requires consideration of the following: (1) the employee's position in the employer's hierarchy; (2) the employee's function and responsibilities; and (3) the amount of discretion the employee exercises.  *Aguas*, 2015 WL 659543, at *21 (citing *Lockley v. State of New Jersey Dep't of Corr.*, 177 N.J. 413, 424 (2003)).

Plaintiff's punitive damages claim fails because he has not shown by clear and convincing evidence that NJTA committed "egregious conduct."  The Court has determined that Plaintiff has failed to demonstrate severe or pervasive harassment on the part of NJTA, *see* Part IV.A.1, *supra*, which undermines his claim that NJTA engaged in "egregious conduct."   Furthermore, an employer's good faith efforts to comply with applicable anti-discrimination laws demonstrate that it did not act in reckless disregard of an employee's protected rights.  *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 544 (1999).  The record shows that NJTA had in place at all times during this lawsuit an anti-discrimination policy, which included mandatory training of employees.  (SUMF ¶¶ 17–39).  Thus, the Court finds that Plaintiff has not met his burden of proving egregious conduct on the part of NJTA by clear and convincing evidence.  *Aguas*, 2015 WL 659543, at *20. Accordingly, the Court grants summary judgment to NJTA, and need not continue its analysis.

### B.  New Jersey Constitution

The Second Count of Plaintiff's Amended Complaint alleges that NJTA violated Plaintiff's "civil rights as guaranteed by Article I of the New Jersey Constitution."  (Am. Compl. ¶ 34).  Because the Court finds that Plaintiff has failed to show severe or pervasive harassment at NJTA, *see* Part IV.A.1, *supra*, the Court grants summary judgment to NJTA.

The New Jersey Constitution provides that, "No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right . . . ."  N.J. Const. Art. I, § V.  Plaintiff argues that he has "sufficiently alleged [facts] that if true, the NJTA discriminated against him in the service of the military."  (Pl. Opp. Br. at 40).  Here, Plaintiff cites to the same allegations he cited in support of his LAD claim.  (*Id.*).  However, in Part IV.A.1, *supra*, the Court explained why the evidence did not show severe or pervasive harassment.  For the same reasons, the Court concludes that the evidence does not show that NJTA discriminated against Plaintiff in violation of his civil rights under the New Jersey Constitution, and therefore grants summary judgment to NJTA.

## VI.  Conclusion

For these reasons, the Court GRANTS Defendants' motion for summary judgment.

Accordingly, it is on this 7th day of April 2015,

**ORDERED** that Defendants' motion for summary judgment is granted; and it is further

**ORDERED** that the remaining counts in Plaintiff's Amended Complaint, (D.E. No. 21), are dismissed with prejudice; and it is further

**ORDERED** that this Order supersedes the Court's March 31, 2015 Order on this motion, (D.E. No. 68); and it is further

**ORDERED** that Plaintiff's time to appeal shall run from the date of entry of this Order.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**